# UNITED STATES BANKRUPTCY COURT FOR THE
# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 12 |
| HERMAN VANDER VEGT, ) | |
| HENDRINA VANDER VEGT, ) | |
| ) | |
| ) | Bankruptcy 12-02144 |
| DEBTORS. ) | |
| ) | |
| IN RE: ) | |
| ) | Chapter 12 |
| BOERDERIJ DE VELDHOEK, LLC, ) | |
| ) | |
| ) | Bankruptcy 12-02146 |
| DEBTOR ) | |
| ) | |

**RULING ON DEBTORS' MOTION FOR AUTHORITY TO USE CASH COLLATERAL, FIRST SECURITY BANK AND TRUST COMPANY'S MOTION TO MODIFY THE AUTOMATIC STAY OR DISMISS THE CHAPTER 12 CASES, AND RBS CITIZENS' MOTION FOR RELEIF FROM STAY**

This matter came before the Court in a hearing on several matters: Debtors' Motion for Authority to Use Cash Collateral; Creditor First Security Bank & Trust Company of Charles City, Iowa's Motion to Modify the Automatic Stay or Alternatively Dismiss the Chapter 12 Cases; and Creditor RBS Citizens, N.A.'s Motion for Relief from Stay. Rush M. Shortley appeared on behalf of the Debtors. John E. Lande and Joseph M. Borg appeared on behalf of First Security Bank & Trust Company of Charles City, Iowa ("First Security Bank"). Ryan C. Holgraves appeared on behalf of RBS Citizens, N.A. ("RBS"). After hearing the parties'

arguments, the Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G)&(M).

## STATEMENT OF THE CASE

Debtors, a dairy farm and its dairy farmers, seek authority of the Court to use cash collateral in these jointly administered cases. Debtors seek cash collateral authority for feed, operating expenses, and to replace cattle affected by stray voltage. First Security Bank resists Debtors' motion for use of cash collateral. First Security Bank requests relief from the automatic stay, and it alternatively asks the Court to dismiss the Chapter 12 cases. In both its resistance and its own motion, First Security argues that its property is not adequately protected and that successful reorganization is unlikely.

RBS, a creditor in the Vander Vegt case, requests relief from the stay to pursue its rights in a vehicle owned by the Vander Vegts. Debtors resist, arguing that RBS is adequately protected.

## FINDINGS OF FACT

The Court held a two-day hearing, April 15–16, 2013, on these matters. The Court first heard arguments on the Motion for Relief from Stay filed by RBS, and a brief recitation of the applicable facts. The remainder of the two days were used for evidence on the Bank's Motion for Relief from Stay or Alternatively to Dismiss

and Debtor's Motion for Use of Cash Collateral. The factual findings, based on that evidence, are presented in the following paragraphs.

Herman and Hendrina Vander Vegt, along with assistance from their son, Jeremy Vander Vegt, run a dairy farm. They run it through a limited liability company, Debtor Boerderij de Veldhoek, LLC ("Boerderij"). The Court is jointly administering the Vander Vegt's and Boerderij's cases (collectively, "Debtors"). Debtors have owned and operated a dairy farm in Butler County, Iowa since 2009. Before that, Debtors operated a dairy farm in Jefferson County, New York. While Debtors still own the New York property, they are not currently farming in New York. They offered some evidence they would like to convert that land to organic farming.

The Vander Vegts have a long history with dairy farming. Herman Vander Vegt in particular has an impressive history of experience, education, and achievements in dairy farming. Most of his experience and training came in Holland, where he and his wife Hendrina were born and raised. They later moved to New York and operated successful and award-winning dairy operations. Their son, Jeremy, eventually joined them in their family dairy business.

The Vander Vegts became interested in dairy farming in Iowa. They became aware of a dairy operation in Butler County, Iowa that First Security Bank had recently repossessed as part of a foreclosure. That dairy operation had been

built and run by another Dutch family. The Vander Vegts eventually agreed to purchase that dairy operation and relocated to Butler County, Iowa.

They purchased the dairy operation directly from First Security Bank. The purchase agreement contained a number of provisions. Only the most important of these provisions for the purposes of deciding these Motions are discussed here. In September 2009, they agreed to purchase the "Dairy Facility with house and real estate" for $1,350,000.00. (Exh. 10.) They provided a real estate mortgage and commercial security agreement in favor of the Bank. They essentially agreed to provide the Bank with a blanket security interest on the land, equipment, livestock, and milk and cattle sale proceeds. They also agreed to sell the New York property and apply any proceeds of the sale to their balance at First Security Bank. Through a series of events not entirely relevant here, the Bank obtained a first mortgage and/or security interest on that New York property.

Debtors collectively—the Vander Vegts and Boerderij de Veldhoek, and the Vander Vegt's son, Jeremy—through his separate holdings—moved cattle from the New York dairy operation to the Iowa operation. Along with cattle purchased for the Iowa operation, the herd numbers were initially around 200 head of cattle.

Over the next several years of operation, the cattle numbers dropped significantly. The anticipated milk production was nowhere near what had been projected. Debtors and Jeremy discovered a significant problem with disease and

4

stray voltage damage that severely affected the cattle and their ability to produce milk. The dairy operation quickly became unable to meet its obligations to the Bank.

The Bank attempted to provide forbearance agreements and work with Debtors to keep the operation afloat until Debtors could arrange new financing. The Bank denied Debtors' requests to provide additional financing to fix problems on the property and, in particular, to replace the majority of the herd because of the stray voltage and disease problems.

Debtors and Jeremy believe that the Bank could have and should have done more to help correct the problems. Debtors noted that the Bank had not disclosed the problems to them before the sale. Debtors still want to work with the Bank to find a consensual plan of reorganization, but will pursue these non-disclosure issues against the Bank if such a plan cannot be achieved.

These bankruptcy cases were originally filed in New York by New York counsel. They were filed in the shadow of foreclosure proceedings in New York and Iowa. The cases were transferred to this District on October 25, 2012.

Before the transfer, the Chapter 12 Trustee in New York hired Jeff Troendle of Hertz Farm Management in Iowa to provide a report on the condition of cows and equipment at Debtors' dairy operation in Allison, Iowa in Butler County. Troendle testified at the hearing and supplied a copy of the report he provided to

the Chapter 12 Trustee in New York. (Exh. B.) Troendle reported that he generally concluded the cattle and the equipment were well cared for and maintained relatively well under the circumstances. He reported that Debtors faced a couple issues that were significantly affecting their operation. He learned this information from Debtors but then confirmed it with other sources. In particular, Troendle reported that Debtors experienced stray voltage issues that occurred shortly after Debtors purchased the farm in September 2009. He confirmed this with Bill Foley, a nutritionist with Agri-King, who had been working with Debtors. Troendle's report (confirmed by his testimony) stated:

> Based on my experience with stray voltage, even after the stray voltage issue is corrected, cows are nearly always irreversibly damaged and this leads to an excessive amount of cull cow sales until a new generation of cows are introduced into the herd or cows are purchases from outside the herd.

(Exh. B at 3).

Troendle also noted (and testified) that the cows were unlikely to respond to diet adjustments to increase milk production "due to the stresses that these cows have been through with the stray voltage" and other factors. (Exh. B, at 4). Troendle concluded the care of the facilities and cows was very adequate. He noted that he gave Debtors four hours notice of his inspection but specifically noted that "it was obvious that this level of sanitation was routine and not just completed for my benefit." Id.

6

Bill Foley, whom Troendle referenced as the source of confirmation of the stray voltage issues, also testified. Foley noted that he had worked with Debtors and Jeremy on nutrition issues. He had worked in the dairy cattle and nutrition industry for years. He noted that Debtors seemed to know what they were doing and might be able to make a go of it if they got past the set-backs they had faced. His observations of the cattle were consistent with stray voltage exposure. He stated they had mastitis and other health issues that Debtors' cows suffered from were strong indications of stray voltage exposure. He noted that stray voltage was a real and unfortunate situation for dairy farmers because it is very difficult—often impossible—to bring dairy cattle back to full production, or even good production, after a stray voltage exposure. He admitted that he had no confirmation of stray voltage on Debtor's farm, but stated that the cattle's condition was entirely consistent with stray voltage.

Jeremy Vander Vegt offered the primary testimony for Debtors. His father, Herman, is sick and on oxygen. His mother, Hendrina, was right by Herman's side at all times. Both Herman and Hendrina testified from the counsel table, as it would have been hard on Herman to have him go to the witness stand. Hendrina wanted to stay by his side. Their testimony was very brief and highlighted their experience. They also both had a bit of a language barrier. Jeremy spoke the best English and had an intimate understanding of the dairy business in general and

7

Debtors' operation in particular. He had been working Debtors' operation almost by himself for the last several months. He had vast experience with Herman and Hendrina and their dairy operation over the years.

Jeremy confirmed the stray voltage problem. He noted it was investigated, the source identified (a well pump), and the issue had now been corrected. He emphasized the need to use cash collateral (milk proceeds and cull sales proceeds) to turn the herd over to new dairy cattle to move beyond stray voltage problems. He noted with specifics how the turnover would be done, and how and when it could lead to a reorganized entity that was profitable. He noted that the Bank's position would be improved by replacing the cows because the Bank would be getting new cows that were better producers than the older cows that had been damaged badly by stray voltage. Jeremy testified about his commitment to Debtors' operation and noted that he had put a significant amount of his own assets (mostly from sale of his personal cattle) into Debtors' operation. He also presented how the Bank would be repaid through projected income and/or refinancing with another Bank. Debtors' counsel then made a professional statement identifying that Debtors would stipulate to an adequate protection plan that he then detailed.

The Bank put on testimony from a hired expert from Texas on the value and viability of Debtors' operation. The expert found the operation could not be viable under the expert's economic model. However, he admitted his model made no

accounting for Chapter 12 bankruptcy or its possible effects on the amount of severed debt service that could exist going forward. He admitted that he did not have experience with Chapter 12 cases. He responded to a hypothetical from Debtors' counsel that included a "stripping down" of the Bank's lien by calling it "ridiculous" because the Bank would want to be paid in full. The expert appeared to have excellent credentials on the national agricultural economy and a well-regarded model for making future projections on that economy, but had little to offer on the subject of a Chapter 12 dairy farm reorganization in Iowa.

The owner of a local cattle sales operation also testified for the Bank. He stated that he had sold cattle that Jeremy brought in and paid the sale proceeds to Jeremy. He stopped doing so when the Bank told him not to pay the money over to Jeremy or Debtors. He testified that some of the cattle Jeremy brought in for sale were on the lean side, but not malnourished.

The Bank's representative at the hearing was Mark Miller, Vice-President for lending. He had oversight of the lending officer that did most of the work on the file. He himself had some limited first hand contact with Debtors. He testified to Debtors' failure to make payments and the Bank's efforts to provide payment forbearance and other help to Debtors. He noted that he believed the operation was not viable, and continued operation would further diminish, not enhance, the value

9

of the Bank's collateral. The Court made some additional factual findings at the end of the hearing and incorporates them here by reference.

## CONCLUSIONS OF LAW

### I. Cash Collateral

Boerderij filed a Motion for Authority to Use Cash Collateral under § 363. Debtors request to use $114,923.00 in sale proceeds of previously sold non-productive dairy cattle, as well as an estimated $42,000.00 in future sales of cull cattle to buy replacement dairy cattle that should be able to produce at higher volumes. Debtors also seek to use $28,660.67 of milk proceeds for feed and general operating expenses. First Security Bank objects to the continued use of cash collateral, claiming that it has a security interest in the cattle sale proceeds and the proceeds from milk sales. It argues that Debtors' operaton has no likelihood of reorganization and Debtors have not offered adequate protection for the use of cash collateral.

If a party has a security interest in cash, proceed or their equivalent, the court should not authorize the use of cash collateral absent a finding of adequate protection. 11 U.S.C. § 363(e). "The issue of adequate protection is a question of fact." TLP Servs., LLC v. Stoebner (In re Polaroid Corp.), 460 B.R. 740, 742 (B.A.P. 8th Cir. 2011) (citing Martin v. Commodity Credit Corp. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985)). In a Chapter 12 case, a debtor may provide

adequate protection in various ways, including cash payments, replacement liens, reasonable rent, or "other such relief" that will adequately protect a creditor's interest in property. 11 U.S.C. § 1205. The Court finds that Debtors' proposal adequately protects any interest First Security Bank may have in the cash collateral. Debtors' cash collateral proposal provides for First Security Bank to receive replacement liens and payments of $2,500.00 a month after Debtors achieve $47,500 in milk sales with payments to increase to $5,000.00 a month upon achieving $50,000 in milk sales. Debtor further provides to have the Dairy Herd Improvement Association ("DHIA") monitor the cattle and provide written reports to First Security Bank.

In light of the evidence presented at the hearing, the Court finds Debtors have shown the need for cash collateral, the importance of the cash collateral to their reorganization, and that it would be improper to deny the use of cash collateral at this point in the proceedings. Debtors are experienced farmers who have proven capable of operating a successful dairy. Debtors previously ran a successful dairy operation in New York from 1984 to 2009. They have faced a number of issues that have impacted their ability to establish an effective operation in Iowa, namely, the effects of stray voltage. Allowing Debtors to use cash collateral to replace cows impacted by stray voltage will give Debtors the

opportunity increase milk production, and thereby improve the value of First Security Bank's interest and increase the likelihood of a successful reorganization.

## II. First Security Bank's Motion

First Security Bank moved the Court for relief from the automatic stay under § 362(d)(1)–(2), or alternatively, for dismissal of the Chapter 12 cases. Section 362(d) allows modifying the automatic stay "for cause, including the lack of adequate protection" or when a debtor lacks equity in property and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(1)–(2). First Security Bank has the burden of showing a lack of equity in the property. 11 U.S.C. § 362(g)(1). Debtor has the burden of proof "on all other issues." 11 U.S.C. § 362(g)(2).

First Security Bank seeks relief from stay on the Debtors' farm property in New York. The schedules show that Debtors lack equity in this property. The Debtors have not used the farm property in New York since they were able to move all of their cows to Iowa, and the fields have remained fallow for the last three years. Debtors proposed to begin an organic farming operation on the New York property, but they did not meet their burden of showing that this property is "necessary to an effective reorganization." Therefore, First Security Bank is entitled to relief from the stay on the New York property.

First Security Bank also asks the Court to lift the automatic stay on Debtors' property in Iowa. However, the Debtors did meet their burden of demonstrating that the Iowa property is "necessary to an effective reorganization." Debtors' plan for reorganization is based around the dairy operation in Butler County. Debtors plan to replace most of their cows and eventually expand their dairy herd to increase production. Debtors will be unable to attempt this part of their reorganization plan absent the real property, livestock, and equipment in Iowa. Further, the Court finds that First Security Bank's interest is adequately protected. Therefore, First Security Bank is not entitled to relief from the automatic stay for the Iowa property. For similar reasons, the Court rejects First Security Bank's motion to dismiss the Chapter 12 cases.

**III. RBS Citizens' Motion for Relief from Stay**

RBS filed a Motion for Relief from Automatic Stay under § 362(d). RBS holds a perfected security interest in Debtors Herman and Hendrina Vander Vegt's personal vehicle, a 2009 Chrysler Town & Country. The Vander Vegt's owe $12,532.87 to RBS, and they are in default under the security agreement. Debtors and RBS agree that there is little to no equity in the vehicle but disagree on the valuation of the van. RBS provided a NADA valuation summary that provided estimated values ranging from $11,425.00 to $16,925.00 (Exhibit D to Motion for Relief from Automatic Stay, ECF Doc. No. 86, at 8.) "The NADA guidelines

constitute some evidence of value but are not conclusive." In re Roberts, 210 B.R. 325, 330 (Bankr. N.D. Iowa 1997). The Court still has a duty to "value the specific collateral in the case before it." Id. at 330–31 (citing In re Johnson, 165 B.R. 524, 529 (S.D. Ga. 1994).

RBS's valuation here was based on a 2009 Chrysler Town & Country with 57,500 miles. The Vander Vegt's vehicle, however, has approximately 110,000 miles and some damage from a deer collision. Thus, the Court finds Debtors' valuation of between $8,300.00 and $9,745.00 to be more accurate for this specific vehicle.

Debtors have offered to provide adequate protection payments based on the $9,745.00 value, amortized over thirty-six months with interest of 4.25%. These payments will adequately protect RBS's interest in the vehicle. See 11 U.S.C. § 1205(b) (allowing Chapter 12 debtors to provide adequate protection through "periodic cash payments"). Further, the vehicle is necessary to an effective reorganization as this is the only vehicle that Herman and Hendrina Vander Vegt own. Debtors not only need the vehicle to transact business, they also need it to transport Herman Vander Vegt with his oxygen tank to doctor appointments and other bankruptcy proceedings. RBS is not entitled to relief from the automatic stay under § 362(d).

**WHEREFORE**, Debtors' Motion for Authority to Use Cash Collateral is **GRANTED**. First Security Bank's Motion to Modify the Automatic Stay is **GRANTED** in part and **DENIED** in part. RBS's Motion to Modify the Automatic Stay is **DENIED**.

Dated and Entered:
April 30, 2013

_____
**THAD J. COLLINS, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT**