# UNITED STATES BANKRUPTCY COURT FOR THE
# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | **Chapter 12** |
| **HERMAN VANDER VEGT,** ) | |
| **HENDRINA VANDER VEGT,** ) | |
| ) | |
| ) | **Bankruptcy 12-02144** |
| DEBTORS. ) | |
| ) | |
| IN RE: ) | |
| ) | **Chapter 12** |
| **BOERDERIJ DE VELDHOEK, LLC,** ) | |
| ) | |
| ) | **Bankruptcy 12-02146** |
| DEBTOR ) | |
| ) | |

### RULING ON DEBTORS' MOTION FOR AUTHORITY TO INCUR SECURED DEBT

This matter came before the Court in a hearing on Debtors' Motion for Authority to Incur Secured Debt. Rush M. Shortley appeared on behalf of the Debtors. John E. Lande and William B. Serangeli appeared on behalf of First Security Bank & Trust Company of Charles City, Iowa ("FSBTC"). After hearing the parties' arguments, the Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D).

### STATEMENT OF THE CASE

Debtors, a dairy farm and its dairy farmers, seek authority to incur secured debt in these jointly administered cases. Debtors seek financing in order to

construct a waste storage facility and a rotational grazing facility. The financing would result in a priming lien on FSBTC's collateral. FSBTC resists, arguing § 364(c) is not applicable. FSBTC also argues that allowing a priming lien under § 364(d) is improper because Debtors are not providing FSBTC with adequate protection. FSBTC also made a Motion to Dismiss for failure to file a plan under 11 U.S.C. § 1221.

## FINDINGS OF FACT

Debtors Herman and Hendrina Vander Vegt, along with assistance from their son, Jeremy Vander Vegt, run a dairy farm through a limited liability company, Debtor Boerderij de Veldhoek, LLC. The Court is jointly administering the Vander Vegt's and Boerderij's cases (collectively, "Debtors"). Debtors have owned and operated a dairy farm in Butler County, Iowa since 2009. Before that, Debtors operated a dairy farm in Jefferson County, New York. While Debtors still own the New York property, they are not currently farming in New York.

The Vander Vegts have a long history of dairy farming. Herman Vander Vegt in particular had an impressive history of experience, education, and achievements in dairy farming. Most of his experience and training occurred in Holland, where he and his wife Hendrina were born and raised. They later moved to New York and operated successful, award-winning dairy operations. Their son, Jeremy, eventually joined them in their family dairy business. Jeremy has assumed

2

a much larger role in the dairy operation as his father's health declined. Unfortunately, Herman passed away after Debtors filed this case. Jeremy will be a critical person when and if the operation moves forward.

The Vander Vegts eventually became interested in dairy farming in Iowa. They became aware of a dairy operation in Butler County, Iowa that FSBTC had recently repossessed. That dairy operation was built and run by another Dutch family. The Vander Vegts eventually agreed to purchase that dairy operation and relocated to Butler County, Iowa.

Debtors purchased the dairy operation directly from FSBTC in September 2009 for $1,350,000. They executed a real estate mortgage and commercial security agreement in favor of FSBTC. This security agreement provided FSBTC with a blanket security interest on the land, equipment, livestock, and proceeds from milk and cattle sales. FSBTC also obtained a security interest on Debtors' New York property.

Over the next several years of operation in Iowa, the Debtors' cattle numbers dropped significantly. The anticipated milk production was nowhere near what Debtors projected. Debtors discovered significant problems with disease and stray voltage, both of which severely affected the cattle and their ability to produce milk. The dairy operation quickly became unable to meet its obligations to FSBTC.

Debtors filed bankruptcy on August 31, 2012 in the Northern District of New York. The cases were transferred to this district on October 25, 2012.

Since filing, Debtors have rectified the stray voltage issue and replaced the affected cattle. Debtors now seek to incur secured debt from First National Bank of Waverly, Iowa in order to construct a $50,000 rotational grazing facility and a $250,000 waste storage facility. The loan would have a six-month duration and carry an interest rate of 8%. It would increase to 18% in the event of default. The loan commitment letter requires the general contractor on both projects to hold a performance bond. Most notably, however, the loan commitment letter requires First National Bank to have a "priming" or first position priority lien on Debtors' property and chattels. This would subordinate FSBTC's current first priority lien.

A critical factor in this case is that the U.S. Department of Agriculture, Natural Resources Conservation Service ("NRCS") has approved Debtors for two grants totaling of $300,000. Those grants would cover the cost of both of Debtors' construction projects upon completion of construction. First National Bank would acquire a security interest in both grants until construction is completed and the grant proceeds could be applied to Debtors' loan with First National Bank. Debtors intend to apply the grant money immediately on receipt to pay the loan off entirely. The total interim financing costs payable by Debtors to First National

Bank for the six-month term of the loan will total between $1,666.00 and $2,000.00 per month.

Jeremy Vander Vegt[1] testified that the current waste storage system has been a problem since 2009. It consumes a significant amount of Debtors' time. The existing system is currently near capacity. It will soon be over capacity when Debtors' carry out their plan to increase the number of cattle in their dairy operation. If the system goes over capacity, the Iowa Department of Natural Resources could cite, penalize, or even close down the dairy operation. Jeremy testified that the new system is an "essential building block" necessary for moving forward with the dairy's recovery.

Jeremy also testified about the importance of the rotational grazing system that will be installed. Debtors have successfully implemented such a system in Debtors' dairy farm in New York. Jeremy testified that the rotational grazing system reduces overhead while generating healthier cattle with increased milk production.

Jeremy also testified that the waste facility would have an outside general contractor, but he would act as general contractor on the rotational grazing project.

---

[1] Herman Vander Vegt was hospitalized at the time of the hearing and unable to testify. His wife, Hendrina, was with him at the hospital. As noted above, sadly, Herman Vander Vegt passed away shortly after the hearing. The Court's condolences go out to the Vander Vegt family.

Additionally, Jeremy stated that the NRCS must approve the plans for both projects. The NRCS has already approved the plans for the waste storage facility and the rotational grazing plans are near completion.

Scott Kaisand also testified for Debtors. Kaisand is a Loan Officer and Vice President at First National Bank. Kaisand testified that if the Court approves the debt, First National Bank intends to move forward with the loan. He also testified that First National Bank requires priming lien on the property. He believes FSBTC is undersecured and First National Bank needs increased security in case the NRCS does not fulfill the grants. Kaisand noted he had no reason to believe that the grants will not come through. In fact, he believes Debtors have a very good business plan and abilities and that they will succeed in reorganizing. He also noted that First National Bank is even considering refinancing Debtors' entire operation. On cross-examination, Kaisand stated that First National Bank's loan to Debtors could be "called" at any time, but that it was not First National Bank's practice to call the loan if everything was going as anticipated.

## PARTIES' ARGUMENTS

Debtors request authority to incur secured credit under 11 U.S.C. § 364(c) and § 364(d). Debtors argue their request under § 364(c) is unopposed and should be granted. Debtors argue their request under § 364(d) should also be granted because FSBTC will be adequately protected. Even though FSBTC would be

primed, the improvements on the property would improve the value of FSBTC's blanket lien on Debtors' property. Debtors also claim that the improvements are necessary to keep the farm in compliance with Iowa law and to ensure Debtors can reorganize successfully.

Debtors argue the 8% interest over the six month term will not diminish FSBTC's security interest. Debtors point out their 2013 Cash Flow Projections already allocate $2,375.00 per month for post-petition credit for a Barn Renovation Loan and a USDA Emergency Loan-Cattle. Debtors have not requested those loan authorizations and the money could simply be redirected to pay the First National Bank loan. Debtors also state that because First National Bank has an interest in the success of the projects, its loan conditions—such as requiring a bond, insurance, and site inspections—also protect FSBTC. Finally, and perhaps most significantly, Debtors claim that they have met, or will soon meet, all of the requirements for the NCRS grant that would effectively pay for the two construction projects in full.

FSBTC resists arguing that Debtors have not satisfied the requirements necessary to subordinate its rights as the primary lien holder. FSBTC claims that its interest is not adequately protected because subordination of its position denies FSBTC the key benefit of its original bargain—the position as priority lien holder on Debtors' property. FSBTC also argues that the adequate protection argument of

Debtors depends on too many variables.  FSBTC points out Debtors have not yet met all of the conditions for the loan—such as submitting tax returns and acquiring a performance bond.  Finally, FSBTC argues that the improvements are not necessary now when Debtors' viability remains in question.

## CONCLUSIONS OF LAW

### I.   Debtors' Motion to Incur Secured Debt Under 11 U.S.C. § 364(c)

Section § 364(c) states:

**(c)** If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
**(1)** with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
**(2)** secured by a lien on property of the estate that is not otherwise subject to a lien; or
**(3)** secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364 (2012).

Section 364(c) does not apply here.  First National Bank's commitment letter states that as a condition of financing, it must be given a priming lien on Debtors' property, which is available only under § 364(d).  The demand of First National Bank for a priming lien renders § 364(c) and all of its sub-parts inapplicable.  Debtors' request to incur secured debt under § 364(c) is therefore denied.

8

## II. Debtors' Motion to Incur Secured Debt Under 11 U.S.C. § 364(d)

Debtors' request to incur secured debt under 11 U.S.C. § 364(d) in order to prime, or subordinate, the lien of an existing senior creditor. In Matter of TC Properties, LLC, No. BK01-82345, 2002 WL 34536625, at *5 (Bankr. D. Neb. Apr. 8, 2002). Section 364(d) states:

> **(d)(1)** The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--
> **(A)** the trustee is unable to obtain such credit otherwise; and
> **(B)** there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (2012).

### A. Debtors' Ability to "Obtain Such Credit Otherwise"

Section § 364(d)(1)(A) requires the debtor to show that less burdensome financing is unavailable. In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). The debtor does not have to show that it sought credit from every possible lender. Id. The parties do not dispute that Debtors are unable to obtain credit without granting the lender a priming lien. Jeremy testified that he had unsuccessfully requested financing from between 15 and 20 other lenders. Debtors have met their burden under § 364(d)(1)(A).

9

### B. Adequate Protection

The key dispute here is whether Debtors have met the requirement of providing FSBTC with adequate protection under § 364(d)(1)(B). "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987) (citing House Rep. No. 95–595, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6295). Whether adequate protection exists is a question of fact to be determined on a case-by-case basis. In re Martin, 761 F.2d 472, 474 (8th Cir. 1985). Debtors carry the burden of proof on adequate protection. In re DB Capital Holdings, LLC, 454 B.R. 804, 822–23 (Bankr. D. Colo. 2011).

Adequate protection is explained in 11 U.S.C. § 361. Adequate protection "may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property." In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994) (quoting 11 U.S.C. § 361 (2012)). Debtors do not offer FSBTC cash payments or an additional or replacement lien. Therefore, they must provide FSBTC with "the indubitable equivalent of its interest in the property." 11 U.S.C. § 361 (2012).

Indubitable equivalence requires "such relief as will result in the realization of value." In re Martin, 761 F.2d at 477 (quoting In re Sheehan, 38 B.R. 859, 864 (D.S.D. 1984)). Adequate protection was meant to be a "flexible concept 'to permit the courts to adapt to varying circumstances and changing modes of financing,' and that such matters 'are [to be] left to case-by-case interpretation and development.'" Id. at 474 (quoting H.R. Rep. No. 595 at 339, 1978 U.S. Code Cong. & Ad. News at 6295).

> In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

Id. at 476–77 (citing Ruggiere Chrysler-Plymouth, 727 F.2d 1017, 1019 (11th Cir. 1984)).

Debtors' main argument is that the construction projects on the property will ultimately increase the value of the property, and as a result, FSBTC will have its indubitable equivalent. FSBTC argues that there is no equity cushion to support both liens and there has been no evidence that the two projects will add value to their collateral.

As the Eighth Circuit notes, to make this determination the Court must first look at the value of FSBTC's claim. Id. at 476–77. It is undisputed that FSBTC is undersecured and there is no equity in the property that could serve as adequate

protection. Next, the Court must identify the risks to FSBTC. Id. If Debtors were unable to complete construction on the projects or make interest payments on the loan before grant disbursal, First National Bank could call the loan and have priority over FSBTC in a foreclosure. This would result in FSBTC receiving approximately $300,000 less than it would without the First National Bank priming lien. The Court, however, finds this risk to be small in this case.

     Finally, the Court must determine whether the increase in the value of FSBTC's collateral protects against risks, consistent with the concept of indubitable equivalence. Id. Other courts that have addressed this question help with the analysis here. In In re Mosello, the court denied a priming lien where the debtor claimed future value constituted adequate protection. 195 B.R. 277 (Bankr. S.D.N.Y. 1996). In that case, the debtor sought a $350,000 loan, secured by a priming lien on the debtor's twelve-acre property. Id. at 281. The first position lienholder, who was undersecured, objected. Id. The debtor's plan was to subdivide the twelve acres into twenty building lots, which the debtor would develop and sell over a three-year period. Id. at 282. The plan would have required the debtor to obtain zoning approvals, install roads and sewage facilities, and then sell the lots at appraised prices within a limited time period, all while remaining within budget. Id. at 290–91.

The court denied the debtor's request, stating that "the debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions which cannot be quantified or verified by objective evidence." Id. at 290. The court noted that real estate development is a highly speculative field. Id. at 293. The court also noted that the plan would leave the current lienholder unprotected during the majority of the reorganization process, even if debtor's proposal went according to plan. Id. at 292.

In In re YL W. 87th Holdings I, LLC, the court similarly found that debtors did not offer enough potential post-construction increase in value to be an indubitable equivalent. 423 B.R. 421, 443 (Bankr. S.D.N.Y. 2010). Debtors sought financing that required a $25 million priming lien over two priority lienholders with claims totaling $66 million. Id. The court held that "numerous contingencies in this case with respect to whether the Debtor could successfully complete construction of the Subject Property and its ultimate value, if completed" prevented the court from approving the priming lien. Id. The court also noted the debtor was required to get Attorney General approval, which the evidence showed was in doubt. Id. The court also observed the uncertain timing of completing the necessary red-tape, construction, and eventual sale of each unit, but the priming loan was due in 180 days. Id. The court also took into consideration the fact that

the debtor had abandoned this project only one year earlier, and that it remained entirely unclear whether the proposed financing would even satisfy the construction and carrying costs the project required. Id.

The court in In re 495 Central Park Ave. Corp. reached a different conclusion. 136 B.R. 626 (Bankr. S.D.N.Y. 1992). There, the court approved a priming lien of $625,000 where the debtor sought to renovate part of an office building in order to attract higher-paying tenants. Id. at 629. The debtor argued that the eventual value increase was adequate protection for the current lienholder, who was undersecured by approximately $1.75 million dollars. Id. at 630. The debtor had specifically identified the prospective tenants and the rent each was willing to pay for the renovated space. Id. at 632. The court concluded that the property's value would increase by at least the amount of the loan and concluded this was an indubitable equivalent sufficient to be adequate protection. Id.

In general, courts have denied financing that included a priming lien where adequate protection relied on increased value in highly speculative circumstances, where time periods for value increase were tight, or where a debtor faced red tape or other hurdles. Compare In re Mosello, 195 B.R. at 277 (finding the project too speculative and carrying too many requirements for successful development over too long of a period of time); and In re YL W. 87th Holdings, 423 B.R. at 443 (finding expensive and long term development project with too many uncertainties

14

inadequate for protection); with Central Park, 136 B.R. at 626 (finding virtually certain increase in value sufficient for adequate protection).

This Court finds this case to be more like the Central Park case. This Court distinguishes In re Mosello and In re YL W. 87th Holdings. In those cases, unlike here, the debtors' projects would take years or unknown lengths of time, leaving the subordinated creditor at risk for a significant period. Debtors' project here is short, taking approximately three months to complete. The proposed financing is six months in length. Additionally, in In re Mosello and In re YL W. 87th Holdings, debtor's ability to make payments on the priming lien depended on the ultimate commercial success of speculative development ventures. Here, Debtors' ability to pay off the priming lien is only dependent on finishing construction on the two projects. At that point, the NRCS will distribute the grants and Debtor will pay off the priming lien. The Court finds that Debtors' projects involve significantly less risk to FSBTC than those in In re Mosello and In re YL W. 87th Holdings.

Another important factor in this case is that the loan requires the contractor on both projects—whether it is Debtor or an outside party—to secure a performance bond. This bond will provide protection for First National Bank during construction. In the event of default, this bond will provide protection not only to First National Bank, but also an additional layer of protection for FSBTC

15

because payment would come to First National Bank from a source other than FSBTC collateral.

FSBTC points out that Debtors have not yet met all of the requirements for the NRCS grants. FSBTC argues Debtors must provide, but have not yet provided, up to date tax returns before they can get grant disbursement. Jeremy testified that Debtors are currently finalizing their tax returns by having a tax attorney review them. FSBTC also raises the point that the NRCS must approve the plans for both projects. The evidence showed, however, that the NRCS has already approved the plans for the waste storage facility and that the plans for the rotational grazing are in their final stages. The Court is persuaded that Debtors will satisfy all of the conditions of the NRCS.

Based on the analysis above, the Court finds that the two projects in this case will ultimately benefit the estate and improve Debtors' ability to reorganize without unjustifiably jeopardizing FSBTC. Jeremy testified credibly about the benefits of the projects—including preventing the spread of contagious disease, staying in compliance with Iowa DNR regulations, reduced overhead, and increased milk productivity. Jeremy referred to the projects as "essential building blocks" necessary in order to move forward. The Court concludes that these projects will more likely than not increase the value of the Debtors' property and FSBTC's collateral. The value increase, the short duration of the priming lien

financing, and the near-certain payments from the NRCS grants provide FSBTC with an indubitable equivalent that qualifies as adequate protection. However, as an additional layer of protection for FSBTC, the Court's approval of Debtors' Motion to Incur Secured Debt is conditioned on Debtors meeting all of the requirements for the NRCS grants prior to First National Bank taking a priming lien on FSBTC's collateral.

### III. FSBTC's Motion to Dismiss

FSBTC moved to dismiss Debtors' case under § 1208(c)(3) in its Objection to the Debtors' Motion to Incur Secured Debt. Section 1208(c)(3) states that the court may dismiss a case for debtor's failure to file a plan timely under § 1221. 11 U.S.C. § 1208(c) (2012). Section 1221 requires the debtor to file a plan within 90 days of filing, unless the court extends the period. Id. § 1221. FSBTC argues that Debtors' have not filed a plan within the specified time period and the case should be dismissed. Debtors argue that FSBTC's request was improperly presented as part of its objection and not as a separate motion. Debtors argue the Court should not consider it.

The Court need not resolve this procedural issue because it finds that Debtors should have additional time to file their plan in this case. There have been a number of delays in getting the plan on file including delays resulting from

consideration of creditor's resistance and the Court issuing decisions. Therefore, the Court denies FSBTC's Motion to Dismiss.

**WHEREFORE**, Debtors' Motion for Authority to Incur Secured Debt under § 364(c) is **DENIED**. Debtor's Motion for Authority to Incur Secured Debt under § 364(d) is **CONDITIONALLY GRANTED**. FSBTC's Motion to Dismiss is **DENIED**.

Dated and Entered:

October 16, 2013

_____
THAD J. COLLINS, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT